**ZENO B. BAUCUS**
**RYAN G. WELDON**
**Assistant U.S. Attorneys**
**U.S. Attorney's Office**
**James F. Battin Courthouse**
**2601 Second Avenue North**
**Suite 3200**
**Billings, MT 59101**
**Phone: (406) 657-6101**
**Fax: (406) 657-6989**
**Email:  Zeno.Baucus@usdoj.gov**
         **Ryan.Weldon@usdoj.gov**

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 23-79-BLG-SPW** |
| **Plaintiff,** | |
| **vs.** | **RESPONSE TO MOTION TO SUPPRESS** |
| **ADOLFO VARGAS LEPE,** | |
| **Defendant.** | |

### INTRODUCTION

Adolfo Vargas Lepe moves to suppress two categories of evidence.  First, he seeks suppression of the July 10, 2023, search of a storage unit, claiming a 38-day delay between seizure and the ultimate search of the storage unit was too long.

1

Second, Lepe seeks to suppress the July 10, 2023, search of an abandoned backpack that law enforcement recovered on the side of the road after Lepe threw it out of his vehicle during a high-speed chase with law enforcement.  Lepe is wrong, and his motion should be denied.

First, the delay in obtaining a search warrant was not unreasonable.  Lepe was in jail, unable to access the storage unit, and failed to make payments on the storage unit at the time of the search, meaning Lepe had a limited possessory interest in the unit.  Additionally, the government, which was actively involved in a multi-faceted and multi-jurisdictional interstate kidnapping investigation, did not impact Lepe's possessory interest in the storage facility.  Even if the delay were unreasonable, the good faith exception applies.  Second, Lepe abandoned the backpack by intentionally throwing it out of his vehicle during a high-speed chase with law enforcement and leaving it on the side of the road in a rural area for 38 days.  *See United States v. Wilson*, 472 F.2d 901, 902 (9th Cir. 1972) ("Search or seizure of abandoned property, even without a warrant, is simply not unreasonable.").  Although Lepe directed others on jail calls to obstruct the investigation by searching for the backpack full of methamphetamine, that does not somehow re-establish standing.  Law enforcement found the discarded bag, and no search warrant was required to search the abandoned property.

2

**FACTUAL BACKGROUND**

**A. Law enforcement learns that Lepe kidnapped Jane Doe and an investigation into his conduct commences.**

Jane Doe was in a romantic relationship with Adolfo Vargas Lepe.  In approximately March of 2023, Jane travelled to her mother's residence in Lander, Wyoming, because she needed a break from the relationship with Lepe.

Lepe disagreed with the decision to separate.  Instead, Lepe instructed Jane to return to Montana.  For example, Lepe texted Jane, "Me and my boys ar[e] coming to [L]ander to see what[']s up with you . . . ."  Lepe ultimately arrived in Lander and told Jane she needed to return with him to Montana, or he would grab her.  Jane was afraid Lepe would kill her because she rekindled a relationship with a former boyfriend, and Lepe was jealous.  Jane ultimately went with Lepe out of fear for her safety and that of her family.

Lepe transported Jane back to Montana.  After doing so, Lepe instituted shocking forms of torture.  For example, Lepe shot Jane in the legs, imprisoned her in a dog kennel for hours on end, beat her with hatchets and metal bars, and repeatedly pistol whipped her, among many other acts.  Jane contemplated suicide, believing such a fate was her only method of escape.

On May 29, 2023, Jane was able to escape from Lepe.  While Lepe was distracted arguing with the family members, Jane ran and hid in a stand of nearby trees and bushes.  To ensure Lepe could not find Jane, she removed her pink-

colored shorts, buried them in the dirt, and laid still—for hours.  After Jane no longer heard Lepe's truck driving up and down the road looking for her, she went to the nearby Cooney Bar and called 911.

> **B.    During the infancy of the kidnapping investigation law enforcement discovers that Lepe trafficked large quantities of drugs.**

Two days after Jane escaped, on May 31, 2023, the Carbon County Sheriff's Office located Lepe driving a silver Dodge truck near the Toy Box Storage facility in Boyd, Montana.  At the time, Lepe had a state arrest warrant for the crimes committed against Jane.  Carbon County conducted a high-risk felony stop.  Lepe initially pulled over, but he refused to comply with commands and sped off.  During the high-speed chase, Lepe ultimately rolled his vehicle, and law enforcement arrested him.

After arresting Lepe, law enforcement contacted the owner of Toy Box Storage.  The owner confirmed Lepe rented a unit at the facility.  The owner cut the lock off Lepe's storage unit and replaced it with a new one.  Importantly, Lepe paid $197.60 on May 12, 2023, for the storage rental.  The effective date of the payment was May 2, 2023.  This mattered because rent was considered late on the 6th of each month, on the 10th of the month Toy Box Storage locked the customer out of the facility, and, after 30 days of non-payment, Toy Box padlocked the unit itself.  *See* Exhibit 1, 302s of Robbie Bart Interviews.  If rent was not paid for 90

days, then Toy Box Storage cut the lock and disposed of the contents at auction.

*Id.* After May 12, 2023, Lepe never paid Toy Box Storage again, although after

the search warrant was executed, it appears that Lepe's daughter made installment

payments. Exhibit 1 at 12; Exhibit 2, Lepe Payment Ledgers. Under the terms of

Lepe's rental contract, Toy Box storage would have locked Lepe out of the facility

on June 10, 2023, and placed their own padlock on Lepe's unit on June 30, 2023.

While in custody, between June 2, 2023, and June 25, 2023, Lepe made

numerous cryptic statements to others about the Toy Box Storage unit and drugs

abandoned on the side the of road. For example, in the affidavit for the search

warrant, FBI Special Agent Luke Smith specifically addressed the Toy Box

Storage unit:

> From my training and experience, I understand that narcotics traffickers
> speak on the telephone using code words when speaking to their
> associates regarding illicit drugs, storage locations for money or illicit
> drugs, and other people involved in their trafficking scheme. This is
> due to the fact that narcotics traffickers understand that law
> enforcement may be listening to their phone conversations and desire
> to obfuscate the content of their conversations as it relates to illegal
> activity. In the context of Lepe's jail calls, I understand cookies to
> mean prepackaged amounts of illicit drugs. I also understand toys and
> toy box to refer to Lepe's storage unit, located inside of Toy Box
> Storage. When Lepe says he wants someone to check on the toy house
> because he does not want them to sell anything, I understand Lepe to
> be referring to items that are located inside of his storage unit. Because
> code words are being used to refer to this location, I have reason to
> believe that evidence, fruits, and instrumentalities of narcotics
> trafficking to be present at the storage unit.

On July 7, 2023, law enforcement presented a search warrant for Lepe's storage unit to United States Magistrate Judge Cavan.  The affidavit in support of the warrant, attached under seal as Exhibit 3, describes the timeline of events that led law enforcement to seek judicial authority to search the unit.  After executing the warrant and searching the storage unit on July 10, 2023, law enforcement found approximately a pound of cocaine and almost two pounds of methamphetamine, some of which is reflected below.



Additionally, the affidavit in support of the warrant contained the following explanation from Agent Smith as it relates to Lepe's abandonment of the backpack while being chased by law enforcement:

A traffic stop ensued and Lepe was arrested shortly after he left Toy Box Storage.  In the reviewed jail calls, Lepe speaks extensively using code words regarding cookies that were tossed and landed near a canal along a roadside.  Lepe repeats to various callers that he needs them to go and pick up the cookies that were tossed.  I understand this to mean

that Lepe was discarding illicit drugs from his vehicle as a result of the pursuit by law enforcement.

Following the search of the storage unit on July 10, 2023, on the same day agents also walked along the ditch and irrigation canal on the sides of Carbonado Road in Boyd, Montana. Law enforcement recovered a gray and black Nike backpack underneath a tree. Law enforcement opened the backpack and inside was approximately 12.5 pounds of methamphetamine, one Mexican Peso, and receipts.

The location and ultimate contents of the bag are identified below:

///

///

///

///

///

///

///

///

///

///

///

///



**ARGUMENT**

**I.    Lepe's motion to suppress the search of the storage shed should be denied.**

To determine whether a search is reasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015).  "An unreasonable delay

between the seizure of a package and obtaining a search warrant may violate the defendant's Fourth Amendment rights." *Id*. Courts "determine whether the delay was 'reasonable' under the totality of the circumstances, not whether the Government pursued the least intrusive course of action." *United States v. Hernandez*, 313 F.3d 1206, 1213 (9th Cir. 2002); *Sullivan*, 797 F.3d at 633 ("Even if the government could have moved faster to obtain a search warrant, the government is not required to pursue the least intrusive course of action."). In evaluating this issue, courts consider a variety of factors, including (1) the significance of the defendant's possessory interest; (2) the government's legitimate interest in holding the property; (3) the period of delay; and, (4) whether the person consented to the seizure. *United States v. Laist*, 702 F.3d 608, 613-614 (11th Cir. 2012).

Law enforcement's 38-day delay in seeking a warrant for Lepe's storage unit was reasonable under the totality of the circumstances. Lepe was incarcerated on May 31, 2023, and has remained in custody since that date. Lepe's incarceration during the delay "significantly dimmish[es]" his possessory property interest in the storage unit. *See United States v. Ortiz*, 2024 WL 418622, pp. 13-14 (C.D. Cal. Feb. 5, 2024) (explaining a defendant's interest is "significantly diminished" if incarcerated); *Sullivan*, 797 F.3d at 633 (noting that if an individual is incarcerated, "and cannot make use of seized property, their possessory interest in that property

is reduced").  At no point between Lepe's arrest and the search was Lepe allowed
to access his rental unit.  There is no evidence that anyone attempted to access the
storage unit on Lepe's behalf during this period or, indeed, that anyone had the
ability to do so.  Exhibit 3 at 4-5 (search warrant application stating unit has not
been opened since lock was replaced and evidence tape appears undamaged); *see
also Sullivan*, 797 F.3d at 633-634 ("[A]n individual who did not even allege[ ],
much less prove[ ], that the delay in the search of packages adversely affected
legitimate interests protected by the Fourth Amendment and never sought return of
the property has not made a sufficient showing that the delay was unreasonable."
(internal quotation marks and citation omitted)).

In addition, Lepe failed to pay his bill to Toy Box Storage any time after
May 12, 2023, and prior to execution of the search warrant. *See* Exhibits 1 and 2.
Rent was considered late by the sixth of the month and, by the tenth of the month,
Toy Box locked the customer out of the facility's gate.  Exhibit 1 at 1.  It appears
Lepe had a master code to the gate due to software issues at the facility, but in any
event Toy Box would have placed its own padlock on Lepe's unit after 30 days of
non-payment.  Exhibit 1 at 12.  Therefore, as of—at the latest—June 30, 2023,
Lepe no longer had access to his storage unit based on Toy Box's policy of
padlocking a unit after 30 days of failure to pay rental fees.  Exhibit 1 at 12.
Neither Lepe nor anybody else attempted to access the unit between May 31, 2023,

and June 30, 2023, before Toy Box would have independently locked Lepe out. Thus, not only was Lepe unable to access the unit by virtue of his incarceration, Lepe also had no access or possessory interest in the storage unit by virtue of Toy Box's rental contract weeks before law enforcement sought the search warrant. Accordingly, the delay between seizure and search did not infringe on Lepe's possessory interest in the unit.

While Toy Box's policies appear to have been sporadically enforced, it is clear that Lepe understood the policy. On a jail call reviewed by law enforcement, Lepe referenced accessing the unit so items would not be sold. Exhibit 3 at 6.[1] Lepe clearly understood the potential to lose his property if he did not pay his bill, but he nevertheless failed to pay, or have anyone else pay, his rental fees to secure his possession of the unit prior to execution of the search warrant. *See United States v. Gilman*, 684 F.2d 616, 619-20 (9th Cir. 1982) (explaining failure to pay storage fees demonstrates evidence of abandonment, meaning defendant had no standing to challenge the search). "Under these circumstances, 'the actual interference' with [Lepe's] possessory interests was minimal." *Sullivan*, 797 F.3d at 634 (quoting *Segura v. United States*, 468 U.S. 796, 813 (1984)).

---

[1] Again, there is no evidence anyone tried to access the storage unit on Lepe's behalf.

Neither Lepe nor anybody else accessed or attempted to access the storage unit prior to the search, Lepe was continually incarcerated, and his access would have been curtailed by Toy Box for non-payment independent of the search warrant before the warrant was sought.  Because Lepe's interest in the storage unit significantly decreased while he was in custody, and even more so after failing to meet his monetary obligations to Toy Box Storage, the delay was not unreasonable.

In contrast to Lepe's limited possessory interest in the storage unit, the government's interest in holding the property was significant.  Lepe was under investigation for interstate kidnapping.  Law enforcement saw Lepe at the storage facility two days after the kidnapping victim escaped from Lepe, and law enforcement confirmed Lepe rented a unit there.  Law enforcement did not know whether evidence related to this violent crime might be located in the storage unit.  Moreover, as noted in Exhibit 3, law enforcement had reason to believe that narcotics may be located inside the storage unit and that Lepe, incarcerated on charges relating to kidnapping, was attempting to cryptically communicate with others about that unit and its contents.  *See Ortiz*, 2024 WL 418622, at p. 13 ("[T]he Government's interest is strong when it has a 'reasonable basis for retaining and searching the [cellphone] based on the likelihood that it contain[s] evidence'" and holding balance of that interest against incarcerated defendant

favored government.).  It was a fair inference here.  Indeed, probable cause was subsequently established that evidence of narcotics distribution was located inside the storage unit.  That inference was confirmed when law enforcement later searched the unit pursuant to a warrant and a significant amount of methamphetamine and cocaine was discovered.

In assessing the length of the delay, courts review the police diligence in pursuing the investigation and the complexity of the investigation.  *Laist*, 702 at 614.  Competing demands from unrelated cases may be a reasonable cause for the prolonged retention of a piece of seized evidence.  *United States v. Hernandez*, 313 F.3d 1206, 1214 (9th Cir. 2002).

The events of late May and June 2023 were fast-breaking and frenetic with respect to the investigation.  Lepe was suddenly under investigation for kidnapping Jane and abusing her over a course of days at his residence near Roberts, Montana.  Law enforcement was focused on several aspects of this specific investigation, including obtaining and reviewing medical records, electronic data, and speaking to multiple witnesses, when it learned that Lepe may also be involved in the distribution of illegal narcotics.  Multiple law enforcement agencies and jurisdictions were involved.  In addition, law enforcement was listening to Lepe's jail calls, which necessitated translating them from Spanish to English for review.  Exhibit 3 at 4-6.

Defendant's reliance on *United States v. Dass*, 849 F.2d 414, 415 (9th Cir. 1988) is misplaced. *Dass* concluded a delay of 7 to 23 days from seizure to search warrant for packages was unreasonable, meaning *Dass* is instructive on requiring diligent pursuit of a warrant to protect the possessory interest in mail. Indeed, the Postal Service's mission is to "bind the Nation together" through "prompt, reliable, and efficient services . . . ." 39 U.S.C. § 101 (emphasis added). But *Dass* offers little guidance given that Lepe was in jail, failed to pay rent for the storage unit, involved no prompt service of mail, and any impact on Lepe's property interest was "virtually non-existent." *Sullivan*, 797 F.3d at 633 (quoting *Segura v. United States*, 468 U.S. 796, 813 (1984) (plurality opinion)). None of these facts existed in *Dass*.

Finally, even if the seizure was improper, the good faith exception applies, and use of the exclusionary rule is unwarranted in this case. *See, e.g., United States v. Smith*, 967 F.3d 198, 213 (2d Cir. 2020) (explaining "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal in light of all of the circumstances"). Law enforcement told the U.S. Magistrate Judge the timeline of when the lock was placed on the storage unit and the subsequent steps taken in the investigation. Exhibit 3 at 2-3. The court signed the warrant. *See, e.g., United States v. Johnson*, 2015 WL 4776096, pp. 6-7 (N.D. Cal. Aug. 13, 2015) (holding

one-year delay did not warrant suppression, and even if it did, good-faith exception applied);[2] *United States v. Harmon*, 2018 WL 5786217 (D. Or. 2018) (identifying the good faith exception and *United States v. Leon*, 468 U.S. 897, 922 (1984), holding "even if the warrant were in some way deficient, Defendant has provided no evidence to suggest that the FBI's reliance on the warrant was not objectively reasonable and the good faith exception to the exclusionary rule should not apply.").

No unreasonable delay existed, and even if it did, suppression is not warranted given the good faith exception.

## II.     Lepe's motion to suppress the search of the backpack should also be denied.

Lepe argues this presents a "niche" case.  Br. 13.  That is wrong.  Lepe threw a backpack of methamphetamine out of his truck during a high-speed chase with law enforcement.  Law enforcement's search of a backpack discarded by someone who is fleeing law enforcement is reasonable.

A warrantless seizure and search of abandoned property is not unreasonable. *United States v. Wilson*, 472 F.2d 901, 902 (9th Cir. 1972); *see also United States v. Fisher*, 56 F.4th 673, 686 (9th Cir. 2022) ("[P]ersons who voluntarily abandon

---

[2] The Ninth Circuit affirmed the district court in *Johnson*, although the circuit did not address the good faith exception.  *See, e.g., United States v. Johnson*, 875 F.3d 1265, 1276 (9th Cir. 2017).

property lack standing to complain of its search or seizure.").  The test for abandonment is not whether all formal property rights have been relinquished, but rather, whether the defendant retained a *reasonable* expectation of privacy in the articles alleged to be abandoned.  *Wilson*, 472 F.3d at 903.  Abandonment is based on intent, and the courts focus on the "totality of the circumstances," including "words, acts or other objective indications . . . ."  *United States v. Lopez-Cruz*, 730 F.3d 803, 809 (9th Cir. 2013).

Throwing items out of a moving vehicle to avoid detection by law enforcement is a classic form of abandonment.  No warrant is required to search the items.  *See, e.g., United States v. McLaughlin*, 525 F.2d 517, 518 (9th Cir. 1975); *United States v. Baker*, 58 F.4th 1109, 1118-1119, n. 3 (9th Cir. 2023); *United States v. Belk*, 174 F. Supp. 2d 138, 143-144 (S.D. N.Y. 2001); *United States v. Flynn*, 309 F.3d 736, 738 (10th Cir. 2002); *United States v. Nelson*, 725 F.3d 615, 622 (6th Cir. 2013) (no legitimate expectation of privacy in gun defendant threw into bushes).

Lepe suggests his mere mention of sending others to retrieve the backpack somehow re-establishes standing under the Fourth Amendment.  Br. 13. ("expressing an intent to retain control").[3]  But the jail calls only outline Lepe's

---

[3] Should Lepe continue to assert he has standing—and a possessory interest over the abandoned backpack—the United States contends that he cannot have it both ways should this case proceed to trial.  One has standing, and an interest over an

attempt—and ultimate failure—to re-establish control.  Indeed, to seriously

entertain Lepe's novel legal theory, courts would have to accept that anytime a

defendant threw contraband out of car during a pursuit by law enforcement, the

defendant could reacquire possessory rights of the abandoned property by quickly

placing a jail call and simply discussing the property.  This is not allowed under

Fourth Amendment jurisprudence.

Because Lepe was unable to require the property, he lacks standing to claim

any reasonable expectation of privacy.  A Virginia state court explained this exact

principle:

> If one leaves a suitcase in a public park overnight, but, the next day,
> one safely retrieves it, there is no question that the person (despite his
> having abandoned the suitcase overnight) reacquires dominion over it
> when he retrieves it and re-establishes his reasonable expectation of
> privacy in it.  *If authorities seized the suitcase from the public place
> (when it was left there unattended), there is no doubt that they could
> search.*  But the temporary abandonment (no matter how complete)
> cannot result in an irrevocable and irreversible loss of a reasonable
> expectation of privacy.  If the owner of the suitcase returns to the park
> and retrieves the suitcase only moments before the authorities arrive to
> seize it, the Commonwealth could not prevail on an argument that the
> person had previously abandoned the suitcase.  Moreover, if the person
> sent a friend to retrieve the suitcase, the owner of the suitcase would
> clearly stand in a derivative posture to object to its search by the
> authorities.

*Virginia v. Eutsler*, 2018 WL 9515220, p. 6 (Va. Cir. 2018) (emphasis added).

Law enforcement recovered the abandoned bag prior to Lepe re-establishing

item containing contraband, or he does not.

possession or obtaining someone to do so on his behalf. The bag sat for weeks on the side of a rural road after Lepe threw it out during a high-speed chase. He had no reasonable expectation of privacy, and he lacks standing to assert a Fourth Amendment violation as to any search of the bag.

### CONCLUSION

The motion to suppress should be denied.

DATED this 27th day of March, 2024.

JESSE A. LASLOVICH
United States Attorney


*/s/ Zeno B. Baucus*
ZENO B. BAUCUS
Assistant U.S. Attorney


*/s/ Ryan G. Weldon*
RYAN G. WELDON
Assistant U.S. Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule, this certifies that the body of the attached response

contains 3,892 words, excluding the caption and certificate of compliance.

JESSE A. LASLOVICH
United States Attorney


*/s/  Zeno B. Baucus*
ZENO B. BAUCUS
Assistant U.S. Attorney


*/s/  Ryan G. Weldon*
RYAN G. WELDON
Assistant U.S. Attorney