**ZENO B. BAUCUS**
**RYAN G. WELDON**
**Assistant U.S. Attorneys**
**U.S. Attorney's Office**
**2601 Second Ave North**
**Suite 3200**
**Billings, Montana 59101**
**Phone: (406) 657-6101**
**FAX: (406) 657-6989**
**Email: Zeno.Baucus@usdoj.gov**
      **Ryan.Weldon@usdoj.gov**

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** <br><br> **Plaintiff,** <br><br> **vs.** <br><br> **ADOLFO VARGAS LEPE,** <br><br> **Defendant.** | **CR 23-79-BLG-SPW** <br><br><br> **UNITED STATES'** <br> **TRIAL BRIEF** |

The United States of America hereby submits the following trial brief.

Adolfo Vargas Lepe is proceeding to trial, scheduled for December 2, 2024, in

Billings, Montana. Lepe is charged in the Second Superseding Indictment (the

"Indictment") with the following crimes:

- Two counts of Kidnapping an adult, in violation of 18 U.S.C. § 1201(a)(1) (Counts 1 and 3);

- One count of Kidnapping a minor, in violation of 18 U.S.C. § 1201(a)(1) (Count 2);

- One count of Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 841(a)(1) (Count 4); and,

- One count of Possession of a Firearm in Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count 5).

Lepe rejected any and all formal plea offers from the government to resolve this case, including those that lower his potential statutory sentencing exposure. The United States anticipates calling approximately 30 witnesses and introducing approximately 90 exhibits. Dependent upon cross-examination and the defendant's case, the trial should last approximately five to seven business days.

**ANTICIPATED PROOF**

*Summary of Evidence:*

The United States intends to prove that commencing around May 2018 through August 2019 Lepe kidnapped one adult and minor victim and transported them in interstate and foreign commerce. Then, in April and May 2023, Lepe continued his kidnapping ways and transported a new victim from Wyoming to Montana and held her against her will. Moreover, during a period that commenced

before he engaged in kidnapping, Lepe possessed with the intent to distribute a significant amount of illegal narcotics. He also possessed a firearm in furtherance of his drug trafficking activities.

*Factual Summary:[1]*

## **Counts 1 and 2 – Kidnapping of Jane Does 1 and 2**

Jane Doe 1, an adult female, met Lepe around July 2017 after she and her two daughters left her husband. Her daughters are Jane Does 2 and 7. Around October 2017, Jane Doe 1 began a relationship with Lepe. Soon, Lepe, Jane Does 1, 2, and 7 traveled with Lepe. They went to, among other locations, North Dakota, Arizona, and Mexico. At one point Lepe locked Jane Does 1, 2, and 7 in a house in Mexico.

Lepe consistently provided Jane Doe 1 with methamphetamine. During one of their trips, Jane Doe 1 and Lepe entered into a romantic relationship. Then, around November 2017 and while they were in Utah, Jane Doe 1 opened one of her bags and, to her surprise, discovered a significant amount of methamphetamine. She confronted Lepe, and he acknowledged that it was methamphetamine and he transported drugs for the cartel. This, in large part, prompted Jane Doe 1 to try and leave Lepe and, around May 2018, she called her

---

[1] The factual summary is described in chorological order, consistent with the order of the counts contained in the second superseding indictment. This summary is not intended to be a complete recitation of the facts anticipated to be presented.

husband and made up a story how she needed return to Montana.  She was able to return Jane Does 2 and 7 to their father, but Lepe would not allow Jane Doe 1 to leave.  Lepe accompanied Jane Doe 1 back to Montana, and then Jane Doe 1 returned with Lepe to North Dakota.

At that point, Lepe began to control Jane Doe 1.  He did not let her out of his sight and informed her that she knew too much about his drug activities.  To prevent her from leaving, Lepe would threaten Jane Doe 1's life, as well as the lives of Jane Doe 1's husband and children.  He stated that he could have members of the cartel kill her family.  Jane Doe 1 believed him.  Indeed, going forward Lepe would continuously assault Jane Doe 1, including hitting her with the end of a firearm.

Lepe took Jane Doe 1 around the country and into Mexico.  She felt that she could not leave.  On one occasion in Mexico, Lepe had Jane Doe 1 arrested.  Due to her fear of Lepe and desire to escape, Jane Doe 1 planned to run for the border once she was released from prison but that did not occur.  Instead, when released from jail, multiple men with firearms were standing outside looking at her, and she was instructed to enter a car that had Lepe inside.

Around July 2018, Jane Doe 1 received custody of her daughter, Jane Doe 2. At the time, Jane Doe 2 was ten years old but Lepe's treatment of Jane Doe 1, and now 2, did not cease.  He continued to restrain them physically and mentally.  For

example, in June 2019 Jane Doe 1 and Lepe were in Yuma, Arizona, when Lepe pulled a firearm and threatened her in front of others.

Jane Doe 2 left with her mom to stay with Lepe and ended up traveling with Lepe and her mother, Jane Doe 1.  They traveled to multiple jurisdictions, including North Dakota, South Dakota, Arizona, California, and Mexico.  Jane Doe 2 explained how, when she was in Yuma, Arizona, she and Jane Doe 1 were often locked in a room together.   This restraint by Lepe continued in Mexico when, again, Lepe locked Jane Does 1 and 2 in a house. While they were traveling together, Lepe made comments to Jane Doe 2 that he would "get her" and, as a result, she did not feel safe around Lepe.  This fear came to a pass when, in August 2018, Lepe sexually assaulted Jane Doe 2 at a residence in Billings.  After assaulting her, Lepe informed her not to tell anyone what happened and that he was going to do it again.  Jane Doe 2's sister, Jane Doe 7, among others, is expected to testify as to witnessing many of these interactions with respect to Lepe's treatment of her mother and Jane Doe 2.   This includes, for example, instances when she was physically restrained by Lepe and his treatment of her.

### Count 3 – Kidnapping of Jane Doe 3

In April 2023 Jane Doe 3 had known Lepe since roughly 2016 or 2017. Jane Doe 3 was abused by Lepe during the course of their relationship and, in April 2023 in an attempt to flee Lepe, Jane Doe 3 traveled to her mother's

residence in Wyoming. Once there, Jane Doe 3 was very afraid, even putting something in the window to prevent anyone from entering the residence.

On or about April 14, 2023, however, Lepe traveled from Montana to Wyoming to collect Jane Doe 3. He threatened her and her family with physical harm if Jane Doe 3 did not return with him to Montana. Lepe ultimately arrived in Wyoming and told Jane she needed to return with him to Montana, or he would grab her. Jane Doe 3 was afraid Lepe would kill her because she rekindled a relationship with a former boyfriend, and Lepe was jealous. Jane Doe 3 ultimately went with Lepe out of fear for her safety and that of her family.

Lepe transported Jane back to Montana. After doing so, Lepe instituted shocking forms of torture. For example, Lepe shot Jane Doe 3 in the legs, imprisoned her in a dog kennel for hours on end, beat her with bats and metal bars, and repeatedly pistol whipped her, among many other acts. Jane Doe 3 contemplated suicide, believing such a fate was her only method of escape.

On May 29, 2023, Jane Doe 3 was able to escape from Lepe. While Lepe was distracted arguing with the family members, Jane Doe 3 ran and hid in a stand of nearby trees and bushes. To ensure Lepe could not find Jane, she removed her pink-colored shorts, buried them in the dirt, and laid still—for hours. After Jane Doe 3 no longer heard Lepe's truck driving up and down the road looking for her, she went to the nearby Cooney Bar and called 911.

**Counts 4 and 5 – Possession with Intent to Distribute Controlled Substances and Possession of a Firearm in Furtherance of a Drug Trafficking Crime**

Two days after Jane escaped, on May 31, 2023, the Carbon County Sheriff's Office located Lepe driving a silver Dodge truck near the Toy Box Storage facility in Boyd, Montana.  Lepe maintained a unit at that facility.  At the time, Lepe had a state arrest warrant for the crimes committed against Jane Doe 3.  Carbon County conducted a high-risk felony stop.  Lepe initially pulled over, but he refused to comply with commands and sped off.  During the high-speed chase, Lepe ultimately rolled his vehicle, and law enforcement arrested him.

While in custody, between June 2, 2023, and June 25, 2023, Lepe made a series of jail calls to select individuals in which, almost exclusively in Spanish, he made numerous cryptic statements about the Toy Box Storage unit and drugs abandoned on the side the of road.   On July 7, 2023, law enforcement presented a search warrant for Lepe's storage unit to United States Magistrate Judge Cavan. After executing the warrant and searching the storage unit on July 10, 2023, law enforcement found approximately a pound of cocaine and almost two pounds of methamphetamine.

Armed with translations of the jail calls described above and following the search of the storage unit on July 10, 2023, on the same day agents also walked along the ditch and irrigation canal on the sides of Carbonado Road in Boyd,

7

Montana.  Law enforcement recovered a gray and black Nike backpack underneath a tree.  Law enforcement opened the backpack and inside was approximately 12.5 pounds of methamphetamine, a significant amount of fentanyl, one Mexican Peso, and receipts.  Finally, witnesses are expected to testify that Lepe possessed a firearm while transporting illegal narcotics.

## WITNESSES

The United States anticipates calling approximately 30 witnesses in its case in chief.  It may call additional rebuttal witnesses after Lepe presents his defense. Included in the roughly 30 witnesses,[2] the United States anticipates calling three individuals that are expected to testify as expert witnesses relating to the testing of the narcotics attributable to Lepe and a forensic extraction of electronic media attributable to Lepe.    In compliance with the Federal Rules of Criminal Procedure Rule 16(b)(1)(C) and Local Rules of Procedure L.R. CR 16.3, the United States filed notice of this potential testimony, respectively.   (Docs. 49; 78-79).

///

///

///

///

---

[2] The United States anticipates calling several law enforcement witnesses.  Two of the projected law enforcement witnesses will likely be called twice for case presentation purposes and to provide a more coherent narrative to the jury.

# ELEMENTS OF OFFENSES

## Counts 1 and 3:

The elements of Counts 1 and 3, Kidnapping of an Adult, pursuant to 18 U.S.C. §1201(a)(1), are listed below.

**First**, the defendant seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away Jane Doe 1 or 3;

**Second**, the defendant held or detained Jane Doe 1 or 3 against her will; and,

**Third**, the defendant traveled in interstate or foreign commerce, or used any means, facility, or instrumentality of interstate or foreign commerce in furtherance of committing the crime.

"Kidnapping – Interstate Transportation and Within Special Maritime and Territorial Jurisdictional of United States ," Sections 17.1 and 17.2, Manual of Model Criminal Jury Instructions for the Ninth Circuit (03/2022); *United States. v. Jackson*, 24 F.4th 1308, 1312 (9th Cir. 2022) (analyzing the four *Berry* factors for kidnapping).

## Count 2:

The elements of Count 2, Kidnapping, pursuant to 18 U.S.C. §§ 1201(a)(1) and 1201(g), are listed below.

**First**, the defendant seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away Jane Doe 2;

**Second**, the defendant held or detained Jane Doe 2 against her will;

**Third**, the defendant traveled in interstate or foreign commerce, or used any means, facility, or instrumentality of interstate or foreign commerce in furtherance of committing the crime;

**Fourth**, Jane Doe 2 had not attained the age of 18;

**Fifth**, the defendant was not a parent, grandparent, brother, sister, aunt, uncle, and individual having legal custody of Jane Doe 2; and,

**Sixth,** the defendant was at least 18 years of age.

"Kidnapping – Interstate Transportation," Section 17.1, Manual of Model Criminal Jury Instructions for the Ninth Circuit (03/2022).

## Count 4:

The elements of Count 4, Possession with Intent to Distribute

Controlled Substances, pursuant to 21 U.S.C. § 841(a)(1), are the following:

First, the defendant knowingly possessed 50 grams or more of actual methamphetamine; 400 grams or more of fentanyl; and a substance containing a detectable amount of cocaine; and

Second, the defendant possessed it with the intent to distribute it to another person.

"Controlled Substance – Possession with Intent to Distribute," Section 12.1, Manual of Model Criminal Jury Instructions for the Ninth Circuit (03/2024).

## Count 5:

The elements of Count 5, Possession of a Firearm in Furtherance of a Drug

Trafficking Crime, pursuant to 18 U.S.C. § 924(c)(1)(A)(ii), are the following:

First, the defendant committed the crime of possession with intent to distribute dangerous drugs, as charged in Count III of the indictment, a drug trafficking crime; and

Second, the defendant knowingly possessed a firearm in furtherance of that crime.

"Firearms-Possession in Furtherance of Crime of Violence or Drug Trafficking Crime," Section 14.23, Manual of Model Criminal Jury Instructions for the Ninth Circuit (12/2023).

## EVIDENCE

The United States anticipates prosecuting its case through numerous witnesses, law enforcement officers and agents, and expert testimony. Much of the case against Lepe will concern lay witness testimony as to his conduct spanning from roughly November 2017 until he was taken into custody on May 31, 2023. Many of these witnesses are victims of Lepe, and they will testify as to their interactions with him. Moreover, much of the evidence will include documentary and electronic evidence involving test messages, jail calls, and photographs.[3]

The United States will introduce this evidence in a format that is efficient for the Court and easy to understand. For example, with multiple Jane Does referenced in the Second Superseding Indictment and Notice pursuant to Fed. R. Evid. 404(b) (Docs 60; 89), the United States anticipates generally referring to these individuals by their first name only during its case-in-chief. Such an approach is consistent with maintaining the privacy of the victims' rights and also allowing minimal confusion. This is discussed in legal issues below.

Also, a short chart that references the various Jane Does by their first name

---

[3] In consideration of the victims and witnesses' privacy, the United States will seek to introduce certain exhibits under seal when offered as exhibits. The government will make the same request of the exhibit and witness list.

will be provided to the Court under separate filing.  This list has also been provided to defense counsel.

Specific issues relating to evidence are detailed below.

## LEGAL ISSUES

### 1. *Interstate Commerce*

As to the kidnapping offenses, the United States does not need to prove that the defendant knew his actions were in or affecting interstate commerce.  *United States v. Feola*, 420 U.S. 671, 677, n. 9 (1975) ("[T]he existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute.").  Rather, the United States only needs to establish that the crime was in or affecting interstate commerce.  Acts and transactions that cross state lines are "in" interstate commerce, whether or not they are commercial in nature.  *See, e.g.*, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 255-256 (1964).  Acts and transactions that are economic in nature and affect the flow of money in the stream of commerce to any degree, however minimal, "affect" interstate commerce. *Gonzales v. Raich*, 545 U.S. 1, 17 (2005).

Here, the United States intends to demonstrate that Lepe transported his kidnapping victims in interstate and foreign commerce, thereby satisfying the jurisdictional hook.  Moreover, Lepe utilized instrumentalities of interstate

commerce, namely cellular phones and vehicles to effectuate his kidnapping.

*United States v. Phea*, 755 F.3d 255, 266 (5th Cir. 2014) (holding that "telephones, the Internet, and hotels that service interstate travelers are all means or facilities of interstate commerce sufficient to establish the requisite interstate nexus"); *United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008).

### 2. *Protection of Victims' Identities*

The alleged victims' full names should be withheld to protect them from potential harassment, undue embarrassment, and other adverse consequences that may result from the nature of their anticipated testimony. *See* Crime Victims' Rights Act, 18 U.S.C. § 3771(a)(8). The government requests that all victims be sworn in, asked to state their first name for the record and, to the extent possible, referred to throughout trial by first name only. This would apply to all Janes Does referenced in the Indictment and Notice pursuant to Fed R. Evid. 404(b).

The government referred to the victims as Jane Does throughout this trial brief but intends to refer to the victims by first name at trial to avoid confusion by other witnesses. This is especially the case with respect to the Jane Does referenced in the Second Superseding Indictment. Using just first names will protect their identities and so the government proposes using their first names for simplicity and to avoid confusion during the testimony of other witnesses.

Referring to victims only by initials or first name is common in cases

involving sex trafficking. *See, e.g.*, *Willoughby*, 742 F.3d at 232 (Sixth Circuit case referring to child sex trafficking victim by initials only); *United States v. Daniels*, 653 F.3d 399, 405 (6th Cir. 2011) (same); *United States v. Marcus*, 628 F.3d 36, 45 (2d Cir. 2010) (adult sex trafficking case rejecting defendant's argument that the district court erred by permitting witnesses to testify by first name only and protecting witnesses' addresses and employment details from disclosure); *Anderson*, 139 F.3d 291, 301-02 (1st Cir. 1998) (referring to child sex trafficking victims by first names only).

### 3. *Legal issues as to kidnapping – Counts 1-3*

Lepe is charged with three counts of kidnapping, in violation of 18 U.S.C. § 1201. Both the Ninth Circuit pattern jury instructions and case law provide clarification regarding the elements of the offense. The government notes these changes for the Court as they are directly related to the proof the government intends to offer.

First, as noted in the Ninth Circuit pattern instructions, "the government is not required to prove that the defendant kidnapped [named victim] for reward or ransom, or for any other purpose." "Kidnapping – Interstate Transportation," Section 17.1, Manual of Model Criminal Jury Instructions for the Ninth Circuit (03/2022). While such language is included in the statute, "the Committee has deleted this language in light of contrary case law." *Id.* citing *United States v.*

*Healy*, 376 U.S. 75, 81 (1964); *Gawne v. United States*, 409 F.2d 1399, 1403 (9th Cir. 1969) (for kidnapping, "an illegal purpose need not be shown.").

Additionally, "the fact that [name of kidnapped person] may have initially voluntarily accompanied the defendant does not necessarily prevent the occurrence or negate the existence of a later kidnapping." "Kidnapping – Interstate Transportation," Section 17.1, Manual of Model Criminal Jury Instructions for the Ninth Circuit (03/2022). *See United States v. Redmond*, 803 F.2d 438, 439 (9th Cir. 1986) ("The fact that one originally accompanies another without being forced does not prevent the occurrence of a kidnapping where force is later used to seize or confine the victim."). Indeed, the issue of what legally constitutes kidnapping was addressed by the Ninth Circuit in *United States v. Jackson*, 24 F.4th 1308 (9th Cir. 2022). In that decision the Court cited with approval the following factors in "defining kidnapping[:]" (1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and, (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense. *Id*. at 1312. While the United States does not believe that the jury should be instructed on these factors, even a cursory application to the instant facts demonstrate that Lepe legally kidnapped the three victims identified in the Indictment. By transporting them

15

over a period of time that included physical and mental confinement, Lepe's

kidnapping of these victims was readily apparent under existing law. *Cf. id.* at

1314 (applying the factors and determining that a seven-minute holding, among

other facts, cut against a legally sufficient kidnapping.).

## EVIDENTIARY ISSUES

*1. Inextricably Intertwined Evidence*

Much of the evidence the United States will introduce is inextricably

intertwined with the charged conduct.[4] "[E]vidence should not be considered

'other crimes' or 'other act' evidence within the meaning of Rule 404(b) if 'the

evidence concerning the other act and the evidence concerning the crime charges

are inextricably intertwined.'" *United States v. Dorsey*, 677 F.3d 944, 951 (9th

Cir. 2012) (*quoting United States v. Soliman*, 813 F.2d 277, 279 (9th Cir. 1987));

*United States v. Troya*, 2013 WL 5461842, *3 (11th Cir. Oct. 2, 2013) (When the

evidence is "necessary to complete the story of the crime," it supports its

inclusion).[5] "There are generally two categories of cases in which [the Ninth

---

[4] All evidence that may be inextricably intertwined has been produced to the
defendant well in advance of trial.

[5] *See also United States v. Edwards,* 485 F.3d 1324, 1344 (11th Cir. 2007)
("Evidence, not part of the crime charged but pertaining to the chain of evidence
explaining the context, motive[,] and set-up of the crime, is properly admitted if
linked in time and circumstances with the charged crime, or forms an integral and
nature part of an account of the crime, or is necessary to complete the story of the
crime for the jury.")

Circuit] . . . concluded that 'other act' evidence is inextricably intertwined with the crime with which the defendant is charged and therefore need not meet the requirements of Rule 404(b)." *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995). Those two categories are when the evidence to be admitted constitutes part of the transaction that serves as the basis for the criminal charge and instances when it is necessary for the prosecutor to offer a coherent and comprehensible story. *Id*. at 1006; 1012-13. It is evidence that is intertwined with the charged conduct and was reflected in the Anticipated Proof section above, and as described and reserved in the government's notice under Fed. R. Evid. 404(b) that, the government contends, is inextricably intertwined to the direct evidence against Lepe. Such evidence is necessary to offering the coherent and comprehensible story of Lepe's kidnapping and possession and transportation of controlled substances.

### 2. *Verbatim Transcripts of Spanish Jail Calls*

As indicated above, the United States anticipates introducing several jail calls made by Lepe during its case-in-chief. While there is no indication that Lepe is not fluent in English, the calls the United States intends to play are almost entirely in Spanish. As such, the United States has generated verbatim transcriptions and translations of portions of these calls into the English language.

The United States, which will seek to introduce the jail calls and transcriptions as exhibits, produced the transcriptions to Lepe more than one month prior to trial.

### 3.  Statements of the Defendant

The United States anticipates introducing a number of statements Lepe made to witnesses, including law enforcement.  These statements will be introduced through witness testimony, jail calls, audio recording, text messaging, and social media records.  These statements are not hearsay and are admissible as admissions of a party opponent under Fed. R. Evid. 801(d)(2)(A).  *See e.g., United States v. Workinger*, 90 F.3d 1409, 1415 (9th Cir. 1996) (noting the defendant's "statements in the transcript were admissions of a party-opponent").  Also, statements made by the defendant in documents are also admissible under Rule 801(d)(2)(A).  *See, e.g., United States v. Pang*, 362 F.3d 1187, 1193 (9th Cir.) ("When offered against Pang, Pang's invoices were admissions, and therefore non-hearsay as defined by Rule 801(d)(2)."), *cert. denied*, 125 S. Ct. 372 (2004); *United States v. Johnson*, 28 F.3d 1487, 1498-99 (8th Cir.) (Western Union money transfers portions completed by defendants properly admitted), *cert. denied*, 513 U.S. 1098 (1995).

What are inadmissible, however, based on well-established case law, are statements of Lepe that *he* elects to elicit through statements (exculpatory or otherwise) through other witnesses or documents.  Lepe may testify at trial about these matters, should either elect to do so; of course, Lepe may not be compelled to

testify at trial under the Fifth Amendment.  Under the Federal Rules of Evidence, a

defendant's statement is admissible only if offered against him; a defendant may

not elicit his own prior statements.  Fed. R. Evid. 801(d)(2)(A).[6]

The defendant is not permitted to include portions of these communications

including "his own exculpatory statements "that are inadmissible hearsay and not

required to be included under the rule of completeness.  Courts have consistently

echoed this sentiment.  *See, e.g., United States v. Wilkerson*, 84 F.3d 692, 696 (4th

Cir. 1996) ("Admissions by a party-opponent are not considered hearsay and

therefore can be admitted against that party."  Fed. R. Evid. 801(d)(2)); *United

States v. Palow*, 777 F.2d 52, 56 (1st Cir. 1985) ("The requirement of Rule

801(d)(2)(A) that an admission be offered against a party is designed to exclude

the introduction of self-serving statements by the party making them.") (emphasis

added) (cited favorably in *Fernandez*)*, cert. denied*, 475 U.S. 1052 (1986).

As one court noted, the defendant could not introduce his inculpatory or

exculpatory statements made to an agent under Rule 801(d)(2), otherwise "parties

could effectuate an end-run around the adversarial process by, in effect, testifying

---

[6] Rule 801(d)(2)(A) provides:
    "A statement is not hearsay if–
    (2) Admission by party-opponent.  The statement is offered against a party
    and is (A) the party's own statement, in either an individual or a
    representative capacity."

without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005).

Indeed, the Ninth Circuit addressed this issue in *Ortega*, a drug and firearms case where the district court precluded the defendant from "eliciting his own exculpatory statements, which were made within a broader, inculpatory narrative." In the excluded oral statements, the defendant claimed that the guns and drugs found in his residence belonged to someone else. *Ortega*, 203 F.3d at 681-682. On appeal, the defendant argued that exclusion of the statements violated the rule of completeness, the Confrontation Clause, Fed. R. Evid. 801(d)(1) (exception for recent fabrication), and Fed. R. Evid. 807 (residual exception). *Id.* at 682. In affirming the exclusion of the defendant's "non-self-inculpatory statements," the Ninth Circuit explained:

> First, Ortega's non-self-inculpatory statements are inadmissible even if they were made contemporaneously with other self-inculpatory statements. The self-inculpatory statements, when offered by the government, are admissions by a party-opponent and are therefore not hearsay . . . but the non-self-inculpatory statements are inadmissible hearsay . . . .
>
> Second, the rule of completeness . . . applies only to written and recorded statements . . . . Even if the rule of completeness did apply, exclusion of Ortega's exculpatory statements was proper because these statements would still have constituted inadmissible hearsay.[7]

---

[7] *Ortega*, 203 F.3d at 682 (citations omitted); *see also United States v. Collicott*, 92

*United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000).

As such, unless Lepe elects to testify, he should not be permitted to elicit testimony of his statements from witnesses or other evidence.

### 4. Text Messages and Other Electronic Communications

The United States anticipates introducing a limited number of electronic communications involving Lepe. First, electronic communications *from* Lepe are admissible under Fed. R. Evid. 801(d)(2)(A).[8] Further, electronic communications *from* witnesses to the defendant are also admissible non-hearsay evidence or hearsay that falls under a number of exceptions.

---

F.3d 973, 983 (9th Cir. 1996) ("'Rule 106 does not compel admission of otherwise inadmissible hearsay evidence'") (citation omitted); *United States v. Dorrell*, 758 F.2d 427, 434-35 (9th Cir. 1985) (no violation of rule of completeness where edited statement does not distort meaning of passage).

[8] *See, e.g., United States v. Burt*, 495 F.3d 733, 738 (7th Cir. 2007) (on Yahoo! chat communication involving the defendant and a third party found on the defendant's computer, "[t]hose portions of the chat which represent Burt's writings were properly admissible as admissions by a party opponent under Fed. R. Evid. 801(d)(2)"), *cert. denied*, 128 S. Ct. 724 (2007); *United States v. Siddiqui*, 235 F.3d 1318, 1322 (11th Cir. 2000) (noting the e-mails "sent by Siddiqui constitute admissions of a party pursuant to Fed. R. Evid. 801(d)(2)(A)"), *cert. denied*, 533 U.S. 940 (2001); *United States v. Safavian*, 435 F.Supp.2d 36, 43 (D.D.C. 2006) ("The [e-mail] statements attributed directly to Mr. Safavian come in as admissions by a party opponent under Rule 801(d)(2)(A) of the Federal Rules of Evidence."); *In re Homestore.com, Inc. Securities Litigation*, 347 F.Supp.2d 769, 781 (C.D.C.A. 2004) (in civil securities action, "e-mails written by a party are admissible as non-hearsay under Fed. R. Evid. 801(d)(2)").

The statements from the witnesses who will not be testifying at trial are admissible as non-hearsay because they are not being offered for the truth of the matter asserted but rather to provide context. *See, e.g., United States v. Burt*, 495 F.3d 733, 738-39 (7th Cir. 2007) (in prosecution for sexual exploitation of a minor, distributing child pornography, and possession of child pornography, in Yahoo! chat communication involving the defendant and a third party found on the defendant's computer, the portion from the third party was admissible as non-hearsay and provided context to the conversation); *United States v. Dupre*, 462 F.3d 131, 136-37 (2d Cir. 2006) (in wire fraud prosecution, e-mails from investors demanding information about defendant's fraudulent scheme were not hearsay when offered not for truth of the assertion that the scheme was fraudulent, but to provide context for the defendant's message sent in response and to rebut defendant's argument that she did not know scheme was fraudulent; no Confrontation Clause issues arose since the statements were offered for a non-hearsay purpose), *cert. denied*, 127 S. Ct. 1026 (2007); *United States v. Safavian*, 435 F.Supp.2d 36, 44 (D.D.C. 2006) (admitting some e-mails which "provide context for the defendant's statements and are not introduced for their truth").

To the extent they are determined to be hearsay – which the United States maintains they are not – communications *from* a testifying witness to Lepe likely fall under a number of hearsay exceptions.  These include:

- Present Sense Impression.  Fed. R. Evid. 803(1);
- Excited Utterance.  Fed. R. Evid. 803(2); or,
- Existing Mental, Emotional, or Physical Condition.  Fed. R. Evid. 803(3).

### 4.  Grand Jury Testimony as Substantive Evidence

Testimony given to a grand jury may be entered as substantive evidence at trial.  If a declarant "testifies and is subject to cross-examination about a prior statement," that statement is admissible non-hearsay if it "is inconsistent with the declarant's [trial] testimony," and the statement "was given under penalty of perjury at a trial, hearing, or other proceeding."  Fed. R. Evid. 801(d)(1)(A); *see United States v. Owens*, 484 U.S. 554, 561 (1988).  The Ninth Circuit has acknowledged that testimony before a grand jury falls within this rule.  *United States v. Champion Int'l Corp.*, 557 F.2d 1270, 1274 (9th Cir. 1977); *see also United States v. Jones*, 739 Fed. Appx. 376, 379 (9th Cir. 2018) (unpublished) (affirming district court's admissibility of grand jury testimony for recanting witness because witness testified and was available for cross examination consistent with Fed. R. Evid. 613(b)).  The use of the grand jury testimony as substantive evidence is the exception to the general rule that prior statements are only admissible for impeachment.  *United States v. Tavares*, 512 F.2d 872, 873 (9th Cir. 1975).

The key requirement for admissibility under Rule 801(d)(1)(A) is that the

prior sworn statement be "inconsistent" with the declarant's trial testimony. *See United States v. Tran*, 568 F.3d 1156, 1162 (9th Cir. 2009). A district court "retain[s] a high degree of flexibility in deciding the exact point at which a prior statement is sufficiently inconsistent with a witness's trial testimony to permit its use in evidence." *United States v. Morgan*, 555 F.2d 238, 242 (9th Cir. 1977).

Here, a number of witnesses provided testimony before a federal grand jury. The transcripts of this testimony, which the government considers Jencks material, will be provided to defense counsel prior to trial. If a victim or witness testifies at trial inconsistent with his or her previous grand jury testimony, the government anticipates introducing the prior grand jury testimony.[9] If the witness provides inconsistent trial testimony, the government will ask the witness about previously testifying before a federal grand jury and being placed under oath, and then will ask the witness to read that portion of their grand jury testimony that is inconsistent with the testimony at trial. Again, such evidence will be considered substantive and not merely impeachment evidence. Defense counsel can then cross-examine the witness about the prior inconsistent statement.

  5. *Admission of Statements made by Jane Doe 3 under Fed. R. Evid. Fed. R. Evid. 803(4).*

---

[9] Also, to the extent a witness does not recall certain events, rather than simply testify inconsistently, the United States may utilize that witness's grand jury transcript to refresh the recollection of the witness.

Following the alleged assaults by Lepe and immediately after she was able to escape, Jane Doe 3 was examined by a medical professional on the way to and at St. Vincent's hospital on May 29, 2023.  Jane Doe 3 made statements to medical professionals during her transport and examination.  It is anticipated that the United States will seek to introduce numerous statements Jane Doe 3 made during those examinations that are memorialized in the reports.

Pursuant to Fed. R. Evid. 803(4) out of court statements made for purposes of medical diagnosis or treatment are admissible as an exception to the hearsay rule.  A statement is admissible under Rule 803(4) if it: "(A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause."  Fed. R. Evid. 803(4).  There is no dispute that Jane Doe 3's statements to a medical professional hours after her escape from Lepe qualify.  Such statements are admissible because, in part, the purpose of the medical examination is to assess the victim's "physical and psychological conditions" and to determine whether the victim was "in a safe environment or remained at risk of further abuse."  *United States v. Chaco*, 801 F. Supp.2d 1200, 1213 (D.N.M. 2011); *see also United States v. Kootswatewa*, 893 F.3d 1127, 1134 (9th Cir. 2018) (holding that the district court properly admitted statements made by victim during SANE examination)*; United States v. Gonzalez*, 533 F.3d 1057, 1062 (9th Cir. 2008) (same); *United*

*States v. JDT*, 762 F.3d 984, 1004-05 (9th Cir. 2014) (statements of victim to clinical social worker properly admitted under 803(4)); *United States v. Lukashov*, 694 F.3d 1107 (9th Cir. 2012) (victim's identification of her step-father as her abuser to CARES facility social worker fell within exception given doctor's testimony that identity of the abuser was relevant to diagnosis); *United States v. George*, 960 F.2d 97 (9th Cir. 1992); *United States v. Tome*, 61 F.3d 1446, 1449 (10th Cir. 1995) (statement to physician identifying assailant is admissible when it is pertinent to victim's treatment or diagnosis).

### 6. *Impeachment Evidence Pursuant to Fed. R. Evid. 609*

The United States provides notice to the Court and Lepe that, should he elect to testify, the government reserves the right to cross-examine him concerning his prior criminal record.

Rule 609(a)(1) allows impeachment of a witness by evidence of prior convictions if the crime was punishable by death or imprisonment for over a year, provided the court determines that the probative value of admitting the evidence outweighs its prejudicial effect to the defendant. *United States v. Dixon*, 547 F.2d 1079, 1082-83 (9th Cir. 1976); *see also* Fed. R. Evid. 609(a)(1).

In making a determination of admissibility under Rule 609(a), and balancing the probative nature against unfair prejudice, a district court should consider five factors: (1) the impeachment value of the prior crime; (2) the point in time of the

conviction; (3) the similarity between the past crime and the charged offense; (4) the importance of the defendant's testimony; and (5) the centrality of the defendant's credibility.  *United States v. Jimenez*, 214 F.3d 1095, 1098 (9th Cir. 2000) *citing United States v. Cook*, 608 F.2d 1175, 1185 n. 8 (9th Cir.1979) (en banc) *overruled on other grounds in Luce v. United States*, 469 U.S. 38 (1984); *United States v. Perkins*, 937, F.2d 1397, 1406 (9th Cir. 1991).  Although "a trial court need not analyze each of the five factors explicitly, 'the record should reveal, at a minimum, that the trial judge was aware of the requirements of Rule 609(a)(1).'" *United States v. Martinez-Martinez*, 369 F.3d 1076, 1088 (9th Cir. 2004) (*quoting Jimenez*, 214 F.3d at 1097-98).  Ordinarily, when a witness is cross-examined about a prior conviction, questioning is limited to the name of the offense, the date of the offenses or counts, the number of the offenses or counts of the conviction, and the sentence.  *See United States v. Howell*, 285 F.3d 1263, 1267-68 (10th Cir. 2002) (collecting cases).

   *7.  Child attendant – 18 U.S.C. § 3509(i)*

   The government anticipates calling the minor victim of the kidnapping offense alleged in Count 2.  For this victim, the government may move the Court pursuant to 18 U.S.C. § 3509(i), to permit the child victim and witness the right to be accompanied by an adult attendant to provide emotional support while the child testifies.  *See* 18 U.S.C. § 3509(i).  While the adult attendant may not help the child

answer questions, the child can hold the attendant's hand or simply be seated near the child while testifying.  The government raises this issue now, although it does not make the request under this motion at this time.  However, as noted in the United States' motion to allow Jane Doe 2 to testify with a comfort item, Jane Doe 2 is expected to testify while holding a stuffed animal.  Doc. 88.  This opposed motion is currently pending before the Court.

Respectfully submitted this 25th day of November, 2024.

JESSIE A. LASLOVICH
United States Attorney


*/s/ Zeno B. Baucus*
ZENO B. BAUCUS
RYAN G. WELDON
Assistant U.S. Attorneys
Attorney for Plaintiffs